**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

GERRARD J. BLAKE,

                                Plaintiff,

        v.                                                No. 09-CV-266
                                                       (DNH/CFH)

EDWIN H. ELFELDT, Coordinator for Sex Offender
Counseling and Treatment Program for New York
State Department of Correctional Services; L.
WEINGARTNER, Deputy Superintendent for Programs
at Five Points Correctional Facility; KATHLEEN ALTMAN,
Correctional Counselor at Five Points Correctional
Facility; TOUSIGNANT, Parole Officer at Upstate
Correctional Facility,

                                  Defendants.[1]

_____

**APPEARANCES:**                       **OF COUNSEL:**

REISMAN, RUBEO & McCLURE, LLP     MARK IRWIN REISMAN, ESQ.
Attorneys for Plaintiff                     CHRISTOPHER W. McCLURE, ESQ.
151 Broadway
Hawthorne, New York 10532

HON. ERIC T. SCHNEIDERMAN          JAMES J. SEAMAN, ESQ.
Attorney General for the                  Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

    Plaintiff Gerard Blake ("Blake"), an inmate formerly in the custody of the New York State

_____

    [1] Seventeen defendants were previously dismissed by a Decision and Order dated
June 15, 2010.  Dkt. No. 60.

    [2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, four present and former DOCCS employees, violated his constitutional rights under the First and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 76. Blake opposes the motion. Dkt. Nos. 78-79. For the following reasons, it is recommended that defendants' motion be granted and Blake's claim be dismissed.

## I. Background

The facts are related herein in the light most favorable to Blake as the non-moving party. See subsection II(A) infra. The specific facts of the case are set forth in the Report-Recommendation and Order filed March 5, 2010, familiarity with which is assumed. See Dkt. No. 57 (Report-Recommendation); Dkt. No. 60 (Decision and Order affirming the findings in the Report-Recommendation). Specifically, the Court dismissed all of Blake's claims except the (1) First Amendment retaliation claims against Altman and Weingartner and (2) Fourteenth Amendment equal protection claims against all defendants. Dkt. No. 57 at 17-19, 29-35. The facts discussed will be those relevant to the claims herein remaining.

### A. Sex Offender Programming for Non-Sex Offenses

DOCCS instituted sex offender counseling for inmates in 1986. Elfeldt Decl. (Dkt. No. 76-1) ¶¶ 3, 5. Policies regarding the Sex Offender Counseling Program were in effect from 2001 through 2008, when the program underwent some major changes due to the Sex

Offender Management and Treatment Act ("SOMTA") legislation passed in 2007 which mandated that DOCCS provide certain treatment to inmates through interdisciplinary approaches. Elfeldt Decl. ¶¶ 6-7; Elfeldt Dep. at 14-15, 19-21. Ultimately, the main "goal of sex offender programming ["SOP"] is to return the inmate to the community with an increased probability that he will not engage in sexually offensive conduct." Elfeldt Decl. ¶ 9; see also Weingartner Decl. ¶ 7.

Individuals may be referred for SOP who are not convicted of sex offenses requiring the individual to register as a sex offender upon release. Elfeldt Decl. ¶¶ 11-12; Weingartner Decl. ¶¶ 8-10; Altman Decl. ¶ 18; Weignartner Dep. at 28-29. There is a separate referral form, designated as a "Non-Sex Offense Referral" form, for such cases. Elfeldt Decl. ¶ 27; Altman Dep. at 9; Elfeldt Dep. at 35. In these cases, members of both the correctional facility counseling staff, located within and specific to the individual facility, and the central office sex offender unit (hereinafter "the sex offender unit"), located in Albany servicing all correctional facilities, must look to the underlying criminal behavior and not just the crime of conviction in determining whether or not sex offender programming is appropriate. Elfeldt Decl. ¶¶ 10, 12-14; Weingartner Decl. ¶¶ 8-10; Elfeldt Dep. at 35-37.

## B. Blake's Programming Recommendations

On October 29, 2003, Blake pleaded guilty to one count of promoting prostitution in the third degree, in violation of N.Y. Penal Law § 230.25(1)[3], and was sentenced as a second

---

[3] Promoting prostitution requires proof of the intentional "[a]dvance[ment] or profit[] from prostitution by managing, supervising, controlling or owning, either alone or . . . with others, . . . a prostitution business . . . involving prostitution activity by two or more prostitutes . . . ." N.Y. Penal Law § 230.25(1).

felony offender to a term of two and a quarter to four and a half years.[4] Compl. ¶¶ 37-39;

Blake Dep. (Dkt. No. 78-2) at 13-14. On February 6, 2004, Blake was received into DOCS

custody at Downstate Correctional Facility. Compl. ¶ 40. An initial assessment of Blake's

needs during incarceration and parole conditions pending release ("EEP") suggested

training in transitional services, alcohol and substance abuse, and vocational training and

work assignments. Id. ¶¶ 41-42. This EEP was confirmed and reiterated by DOCCS staff

when Blake was transferred to Sing Sing Correctional Facility. Id. ¶¶ 43-44. The EEP

failed to include any reference regarding the need for a SOP or parole conditions. Id. ¶¶

40-45.

On May 29, 2004, Blake was transferred to Five Points Correctional Facility ("Five

Points"). Compl. ¶ 47; Altman Decl. ¶ 8. Upon arrival, Blake was told by defendant

counselor Altman[5] that his EEP had remained the same as that originally set by the

counselors at Downstate, which still did not include provisions for SOP or parole conditions.

Compl. ¶ 48; Altman Decl. ¶ 9; Dkt. No. 76-8; Blake Dep. at 37, 47-50; Altman Dep. at 17-

---

[4] Blake was involved in a prostitution ring with two other co-defendants, Michael Smith and Kenny Carter. Blake Dep. at 24-25; Dkt. Nos. 78-8, 78-9. In that capacity, Blake managed four women, driving them to specific areas to have sex with patrons and collecting their earnings. Blake Dep. at 27-28. Both Smith and Carter were arrested with Blake for engaging in essentially the same actions, however, Blake contends that, while all three were convicted of substantially similar criminal actions and conduct, Smith and Carter were treated differently than he was. Id. at 26-27, 28-29.

[5] Defendant Altman, as a corrections counselor, was responsible for inmate programming, but only for those inmates housed at Five Points. Altman Decl. (Dkt. No. 76-7) ¶¶ 2-3. Specifically, Altman was not involved in sex offender programming and instead specialized in coordinating inmate marriages. Altman Decl. ¶¶ 6-7; Altman Dep. (Dkt. No. 78-3) at 6. Altman also testified that she had no independent recollection of Blake or his case outside of her review of the associated documentation filed in connection with the present motion. Altman Dep. at 12-14.

22.  Altman also interviewed Blake again in October 2004 and January 2005, still indicating

no need for either aggressive replacement training ("ART") or SOP.  Altman Decl. ¶ 10;

Blake Dep. at 51-53; Altman Dep. at 23-30; Weingartner Dep. at 65.

On March 11, 2005, Blake was involved in an altercation with another inmate. Compl. ¶

51.  On April 1, 2005, during his interview with Altman, Blake was informed that ART was

recently included in his EEP due to his involvement in the altercation.  Id.  ¶ 52; Altman

Decl. ¶ 11; Dkt. No. 76-9; Blake Dep. at 38, 42, 54-55; Altman Dep. at 31-35.  Blake

disagreed with the decision and terminated the interview.  Compl. ¶ 52; Blake Dep. at 38,

44.  Shortly thereafter Blake filed a grievance[6] against Altman for her decision to include

ART in his EEP.[7]  Comp. ¶ 53; Altman Decl. ¶ 13; Dkt. No. 76-19 at 1-10; Blake Dep. at 38-

39, 58-59.  Blake's grievance was denied and he was instructed to address his concerns

with defendant Weingartner.  Blake Dep. at 58-62.

Defendant Weingartner was the Deputy Superintendent of Programs at Five Points and

responsible for both inmate counseling programs and the counseling staff who ran those

programs.[8]  Weingartner Decl. (Dkt. No. 76-4) ¶¶ 1, 3; Weingartner Dep. (Dkt. No. 78-4) at

---

[6] "The IGP is a three-step process that requires an inmate to: (1) file a grievance
with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent
within four working days of receiving the IGRC's written response, and (3) appeal to the
CORC [Central Office Review Committee] . . . within four working days of receipt of the
superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004)
(internal citations omitted).

[7] Altman denies ever learning of the grievance, supporting her assertions with the
fact that when grievances are filed, staff members are "given an opportunity to respond in
writing," a response which Altman could not find in the file.  Altman Decl. ¶¶ 13-14.

[8] Upon arrival to Five Points, inmates would meet with corrections counselors who
would complete an initial review of the programming needs of the inmate which
Weingartner would eventually review.  Weingartner Dep. at 13-6  Weingartner "would

7-13. Weingartner had no personal knowledge of Blake until he received a letter authored by Blake on May 5, 2005. Weingartner Decl. ¶ 14; Weingartner Dep. at 16-17.[9] Altman also could not recall ever speaking with Weingartner about Blake and vice versa. Altman Decl. ¶ 20; Altman Dep. at 40; Weingartner Dep. at 54, 71. Blake contacted Weingartner, as previously instructed, because he was upset that, after being involved in an altercation in which he was determined not to have been the aggressor, Altman recommended ART despite Blake's noted lack of culpability in the fight. Weingartner Decl. ¶ 15; Dkt. No. 76-5; Blake Dep. at 39, 60-62.

Weingartner's practice, when evaluating such complaints about inmate program referrals, was to look up the instant offense and classification screens which would have shown that Blake was convicted of Promoting Prostitution 3rd. Weingartner Decl. ¶ 18.

> [Weingartner's] professional opinion [wa]s that prostitution involves violence, threats of violence and sexually abusive behavior. However, [Weingartner] did not believe it to be within [his] authority to assign an inmate to a program that was, for the most part, crime specific [thus he] most likely would not have called central office [sex offender unit] but for the fact that we had been advised to consider non-traditional offenses as possible referrals for sex offender counseling.

Weingartner Decl. ¶ 22; Dkt. No. 76-6; Weingartner Dep. at 37-39, 41-44 (explaining that Weingartner believed that the ultimate discretion or authority to decide whether SOP was warranted lie with Elfeldt at the sex offender unit, thus, as customary practice, Weingartner

---

routinely contact central office staff if [he] had any questions [about referrals or programming needs] . . . . " Weingartner ¶ 4.

[9] Weingartner explains that due to the number and frequency of inmate and staff requests and memoranda which he receives monthly, in conjunction with the passage of six years, he has no independent recollection of Blake. Weingartner Decl. ¶¶ 16-17.

would often consult with Elfeldt about such issues). Blake's guidance file contained a memorandum authored by defendant Weingartner to Blake whereupon Weingartner indicated that he reached out to the sex offender unit for consultation regarding Blake's programming status. Elfeldt Decl. ¶ 32. Weingartner does not specifically remember what the arrangements were for making the instant referral or who precisely he spoke too, though he assumed it was probably Elfeldt. Weingartner Decl. ¶¶ 24-25; Weingartner Dep. at 40-45. Elfeldt does not remember receiving this particular call, though he was constantly answering this identical question from all facilities regarding various inmates and the potential for SOP. Elfeldt Decl. ¶ 32; Elfeldt Dep. at 11-12, 29-31. When receiving such calls, Elfeldt usually suggested that the facility submit an electronic referral for further review by the sex offender unit. Elfeldt Decl. ¶ 33; Elfeldt Dep. at 31.

As previously stated, Weingartner responded to Blake on May 9, 2005, stating that after consulting with the sex offender unit, Blake's conviction for promoting prostitution warranted his inclusion in not only ART, but also potentially SOP. Weingartner Decl. ¶ 19; Dkt. No. 76-6; Blake Dep. at 39, 62-64. Thus, Weingartner indicated to Blake that he was being referred to the sex offender unit for consideration of whether he needed to participate in SOP. Dkt. No. 76-6; Blake Dep. at 63-64. Additionally, per protocol, this memoranda was also sent to Altman, Blake's assigned counselor. Weingartner Decl. ¶ 20.

In or about 2006, when the present complaint occurred, Elfeldt and one other person composed the sex offender unit, responsible for reviewing referrals provided to them by counseling staff within the correctional facilities which housed approximately 63,000 inmates. Elfeldt Decl. ¶¶ 15-18; Eldfeldt Dep. (Dkt. No. 78-5) at 7. The sex offender unit

was processing approximately 2,000 sex offender referrals that year. Elfeldt Decl. ¶ 29.[10]

Corrections counseling staff would "refer to [the] sex offender unit those inmates they thought needed the program based upon material contained in documents, such as the pre-sentence report, revealing the inmates' behavior during the commission of their crimes of conviction. Elfeldt Decl. ¶ 18; <u>see</u> <u>also</u> Weingartner Decl. ¶ 12 (explaining that correction facility staff would send referrals to the central office sex offender unit as opposed to making programming recommendations themselves). Given that individual facilities' counselors would conduct the background reviews, inconsistencies with referrals would occur as different counselors would come to different conclusions about the same underlying actions; therefore, to improve standardization, the referrals were sent to the sex offender unit which was the only entity able to establish the need for sex offender programming. Eldfeldt Decl. ¶¶ 21-24; Elfeldt Dep. at 31-32. The sex offender unit would receive an electronic referral from the correctional facility, evaluate the paperwork, and then respond electronically, via email, to the facility about whether it recommended sex offender programming or not. Elfeldt Decl. ¶¶ 19, 26, 28. That was the end of the sex offender unit's involvement with the inmate. Elfeldt Decl. ¶ 19. If an inmate was not referred to the sex offender unit by the corrections counseling staff, the sex offender unit would likely have no knowledge of that inmate. Elfeldt Decl. ¶ 20. Elfeldt stated that, during his tenure, any inmate convicted of promoting prostitution was referred for sex offender programming. Elfeldt Dep. at 32. However, while standardization attempts made improvements, the sex offender unit was still reliant upon the corrections counseling staff for referrals. Elfedt Decl.

_____

[10] Due to the large volume of referrals, Eldfeldt acknowledged having no "clear recollection of . . . Blake's case." Eldfeldt Decl. ¶ 30.

¶ 25.  If the sex offender unit decided sex offender treatment was needed, the correctional counselor assigned to the inmate would add that treatment to the inmate's programming assignments.  Weingartner Decl. ¶ 13.

A Non-Sex Offense Referral was sent from Five Points to Elfeldt, concerning Blake, on May 11, 2005.  Elfeldt Decl. ¶ 34; Dkt. No. 76-2.  After sending the referral, Weingartner had no further involvement in the decision whether or not to place Blake in sex offender counseling.  Weingartner Decl. ¶ 26; <u>see also</u> Blake Dep. at 134 (explaining that Weingartner told Blake that the decision to refer him for sex offender programming was Elfeldt's decision).  Elfeldt recommended Blake for sex offender programming, as memorialized in the electronic response dated May 12, 2005.  Elfeldt Decl. ¶ 35; Dkt. Nos. 76-3, 76-4; Elfeldt Dep. at 66.  Elfeldt had no personal knowledge about Blake "prior to making the recommendation, and was not aware of any grievance or grievances he may have filed."  Elfeldt Decl. ¶ 36; <u>see also</u> Elfeldt Dep. at 41.

Pursuant to the EEP dated May 12, 2005, written in Altman's handwriting, Blake was officially recommended to take both ART and SOP.  Altman Decl. ¶ 15; Dkt. No. 76-10; Altman Dep. at 46, 55.  Altman contends that she has no knowledge as to why SOP was added and that she did not recall referring Blake to the sex offender unit.  Altman Decl. ¶ 16; Altman Dep. at 46, 48-49.  These programs were mandated by Altman (1) three days after Weingartner authored his response letter back to Blake and sent Altman the courtesy copy of the memorandum, explaining that pursuant to the sex offender unit a referral to them concerning Blake was being made and (2) the same day that Elfeldt sent an email back to Five Points stating Blake was officially recommended by the sex offender unit for additional programming.  Altman Decl. ¶ 15; Weingartner Decl.  ¶ 19; .  Elfeldt Decl. ¶ 35;

9

Dkt. Nos. 76-3, 76-4, 76-6; Blake Dep. at 75-78.  These recommendations were also echoed in the Counselor Referral Form of July 1, 2005, which indicated that both ART and SOP were added to Blake's list due to a decision made by the sex offender unit.  Altman Decl. ¶ 18; Dkt. No. 76-11.

Blake again disagreed with this assessment.  Blake Dep. at 39-40, 64-67.  On May 18, Weingartner responded, stating "[t]here is a reasonable public protection issue in having inmates properly prepared for release through programmic involvement . . . [and Weingartner] c[ould] readily understand the coercive potential in such a criminal act and c[ould] readily appreciate that a fuller spectrum of program participation may be warranted." Dkt. No. 78-6.

On December 18, 2005, Blake was transferred to Upstate Correctional Facility ("Upstate") whereupon he was informed that his EEP now contained both ART and SOP. Compl. ¶¶ 62-63.  On December 30, 2005, Blake was interviewed by defendant Tousignant, a parole officer at Upstate, who, Blake later determined, recommended sex offender treatment among the special parole conditions to which Blake may be subject to had he been released on parole.  Id.  ¶¶ 64, 67; Tousignant Decl. (Dkt. No. 76-12) ¶ 5; Blake Dep. at 89-93.  Tousignant made such recommendations via an Inmate Status Report, for which Tousignant interviewed Blake and reviewed his parole folder, DOCCS database, and Blake's programming and disciplinary histories.  Tousignant Decl. ¶¶ 6-10; Dkt. No. 76-13. Tousignant signed his Inmate Status Report on February 6, 2006 and passed it along to his supervisor, Darrel Gregory, who approved the report.  Tousignant Decl. ¶ 11; Dkt. No. 76-13 at 6.  That was the last Tousignant saw of the report.  Tousignant Decl.  ¶ 11.

Tousignant had never met Blake prior to interviewing him and was not aware of any

grievances Blake previously filed at Upstate or any other facility.  Tousignant Decl. ¶ 17.

Blake agrees that he had never met or spoke with Tousignant previously.  Blake Dep. at

135.  Moreover, Tousignant "did not formulate the specific sex offender conditions that were

to actually apply to . . . Blake[, r]ather [Tousignant's] recommendation was that sex offender

conditions, generally, be applied."  Tousignant Decl. ¶ 12; see also Dkt. No. 76-13 at 5

(stating that Blake's supervision needs may include "hav[ing] to follow various sex offender

conditions, upon release.").  Upon release, if granted, the Parole Board could either accept

or reject the recommendations in the Inmate Status Report, but most often the Board

refrained from deciding and instead delegated the authority to determine the specific parole

conditions, including whether and which sex offender conditions apply, to the field Parole

Officer assigned to the parolee upon his release.  Tousignant Decl. ¶¶ 14-16.

    Blake was denied parole in February 2006, for which Tousignant prepared the Inmate

Status Report, and again in February 2008, when third party Kratzenberg prepared his

Inmate Status Report.  Tousignant Decl. ¶ 13.  Tousignant was not in any way involved with

the subsequent preparation of the Kratzenburg report, or any other report.  Tousignant

Decl. ¶ 13.

    In March 2008, Blake received a letter from Elfeldt regarding sex offender treatment

explaining again that, while not convicted of a crime mandating registration as a sex

offender upon release, Blake was still "convicted of a sex offense and . . . [was] detained in

a supervising agency that has jurisdiction to review [the] conviction and make appropriate

program recommendations."  Dkt. No. 78-7 at 2.  The following month, April 2008, Blake

received a second letter from Elfeldt regarding participation in sex offender programming.

Dkt. No. 78-7 at 1.  Elfeldt explained that:

the Department ha[d] broad discretion in determining what programs to recommend for each inmate. The Department relies upon the crime(s) of conviction, past criminal history and other information in determining what programming is appropriate . . . [and] the Department has the responsibility to establish programs and classification procedures designed to assure the complete study of the background and condition of each inmate and the assignment of each inmate to a program that is most likely to be useful in assisting him to refrain from future violations of the law.

Dkt. No. 78-7.

In 2009, Blake was released on parole. Blake Dep. at 94. As a condition of his release, he is subjected to a sex offender condition attached to a counseling obligation. Id.

## C. Blake's Co-Defendants

Both Altman and Weingartner did not know either of Blake's co-defendants. Altman Dep. at 62; Weingartner Dep. at 47-48. Neither of the co-defendants were ever housed at Five Points. Dkt. No. 76-14 (Carter's location records showing placement at Ulster, Queens, Lakeview, Summit, and Lincoln facilities); Dkt. No. 76-15 (Smith's location records showing placement Downstate, Ulster, Camp Gabriel, Queens, Sing Sing, Adirondack, Clinton, and Upstate facilities). Elfeldt also could find no record of either Michael Smith or Kenny Carter being referred to the sex offender unit for a decision on the appropriateness of SOP. Elfeldt Decl. ¶ 38. However, Elfeldt did receive "dozens of referrals over the years for inmates convicted of Promoting Prostitution 3rd [and t]o the best of [his] recollection, [Elfeldt] recommended each and every one of them for sex offender programming," which Elfeldt would have also recommended for Smith and Carter had he received referrals from the various correctional facilities for them. Elfeldt Decl. ¶¶ 39-40; see also Elfeldt Dep. at 51-53, 55-60, 80, 82-87.

12

Tousignant was only assigned inmates who were housed at Upstate, and Blake's first co-defendant Carter was never housed at Upstate (Dkt. No. 76-14) and his second co-defendant Smith was never officially transferred to Upstate, being housed there for thirty days for the express purpose of serving a short disciplinary disposition (Dkt. No. 76-15 at 3-4). Tousignant Decl. ¶¶ 20-21.[11] Moreover, when co-defendant Smith finally did have a parole appearance in 2006, his paperwork was prepared by third party Fournia from Adirondack Correctional Facility. Tousignant Decl. ¶ 23; Dkt. No. 76-16. Tousignant had no input or involvement in either co-defendant's recommendations. Tousignant Decl. ¶ 24.

## II. Discussion

After the previous motion was decided, Blake's two remaining complaints are that (1) defendants violated his First Amendment rights when he was designated to receive SOP after filing a grievance against Altman and (2) Blake contends that his Fourteenth Amendment rights to Equal Protection were violated when he was the only one of his co-defendants required to undergo SOP. Defendants move for dismissal on the grounds that his constitutional claims are meritless and they are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the

---

[11] Neither of Blake's co-defendants were recommended sex offender training during their incarceration or sex offender conditions upon their release. Blake Dep. at 31-37.

absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).


## B. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Adverse action is defined as "retaliatory conduct [which] would deter a similarly situated individual of ordinary firmness from exercising his . . . constitutional rights . . . ." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (citations omitted).  "Types of circumstantial evidence that can show a causal connection between the protected conduct

and the alleged retaliation include temporal proximity, prior good discipline, finding of not

guilty at the disciplinary hearing, and statements by defendants as to their motives."

Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a
> temporal relationship is too attenuated to establish a causal
> relationship, so courts judge the permissible inferences that can be
> drawn from temporal proximity in the context of particular cases.
> However, courts have found that six and eight month gaps
> between the protected conduct and adverse action were sufficient,
> while in other circumstances three months was considered too
> long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and

citations omitted).

   However, courts must view retaliation claims with care and skepticism to avoid judicial

intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp.

2d 204, 214-15 (N.D.N.Y. 2008).  Therefore, conclusory allegations alone are insufficient.

Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that

"claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued

with full discovery.")).  If the plaintiff establishes these elements, the burden shifts to the

defendants to show by a preponderance of the evidence that they would have taken the

same action against the plaintiff absent his exercising of the protected conduct.  Graham,

89 F.3d at 79.

   In this case, Blake contends that as a result of his grievance against defendant Altman,

he suffered the adverse action of having the SOP included in his file.  To support such

contentions, Blake states that his file shows that prior to filing the grievance against Altman,

there were multiple referrals submitted, at least one authored by Altman, indicating that

Blake did not need the SOP. Blake filed the grievance against Altman in April 2005 and was informed by Weingartner that his case was being referred for consideration of SOP in May 2005. Thus, in less than one month after the grievance was filed, Blake's case underwent SOP review.

Filing grievances is an action protected by the First Amendment, thus, Blake has established engagement in constitutionally protected conduct. However, Blake has failed to establish the other two prongs of the retaliation analysis. First, recommendation for SOP does not constitute an adverse action. The SOP program is not a deprivation or punishment, rather it is a voluntary program which increases the chances of successful reintegration upon release. Recommendation into a program does not constitute an action which would deter a similarly situated inmate from exercising his constitutional rights, specifically continuing to file grievances.

Moreover, Blake has failed to establish causation for each named defendant. While defendants themselves may not recall the timing or nature of various conversations surrounding Blake's referral to the SOP, the underlying documentation and defendants' admissible testimony regarding the custom and practice of their positions indicates that Blake's referral happened as follows. After being received at Five Points, without a designation in his EEP for ART or SOP, Altman continued to recommend that Blake maintain the EEP status with which he entered the facility. After being involved in an altercation, Altman recommended ART. Blake was unhappy with that designation, so he filed a grievance. In response to his grievance, the IGRC recommended Blake correspond with Weingartner. Weingartner examined Blake's underlying criminal conduct and, pursuant to an expansion in the SOP, thought that the crime of promoting prostitution

involved violence, control, and coercion which needed to be addressed through additional

DOCCS programming.  Weingartner contacted Elfeldt to ask his opinion regarding Blake's

programming status, as memorialized in a memoranda Weingartner authored to Blake.

Elfeldt recommended that Weingartner send him a non-sex offender referral, which

Weingartner did.  Elfeldt recommended SOP and communicated that recommendation

through an e-mail to Five Points.  Altman then changed Blake's EEP, that same day, to

reflect the addition of ART and SOP, presumably pursuant to the sex offender unit's

direction which was contained in the aforementioned e-mail.  Blake was subsequently

transferred, months later, and met Tousignant for the first time, when Tousignant

interviewed him to assist in developing a packet for review at the parole hearing.

Tousignant recommended that sex offender conditions become part of Blake's parole,

failing to articulate any specific conditions as that was not his responsibility.  Blake was

denied parole when Tousignant authored the underlying paperwork, and eventually granted

parole and assigned sex offender conditions at a later date, during which Tousignant had

no involvement.

    Blake has failed to establish a causal connection, with respect to any of the named

defendants, between filing the grievance and receiving an adverse action.  First, there is no

indication that Altman knew that a grievance was filed by Blake, or of any subsequent

communications between Blake and Weingartner or Weingartner and Elfedlt.  Second,

Altman did not place the referral inquiry with the sex offender unit.  Such questions, as

memorialized in his memoranda, came from Weingartner.  Third, Altman was not

responsible, or able, to recommend Blake for SOP.  Those recommendations only came

from the sex offender unit.  Thus, despite the proximity between the filing of the grievance

and the referral to SOP, it is unchallenged that Altman was unaware of the grievance, she did not set into motion the referral for the SOP, and she did not have the authority to make the recommendation for the SOP. Therefore, even if SOP is viewed as an adverse action, Blake has failed to demonstrate that Altman was responsible for determining that he should undergo it.[12] Accordingly, the link between the grievance, the referral, and the ultimate recommendation are, at best, tenuous to Altman and insufficient to raise a question of material fact with respect to a causal connection.

While Weingartner was clearly aware of Blake's grievance regarding Altman's recommendation of ART and both he and Altman worked at Five Points, there is nothing in the record to indicate that Weingartner's subsequent actions in contacting Elfeldt or referring Blake for SOP were motivated by an agreement, understanding, or plan which he and Altman had together conceived. Thomas v. Andrews, No. 97-CV-267E(SR), 2006 WL 2827682, at *7 (W.D.N.Y. Sept. 29, 2006) (granting defendants' motion for summary judgment because the mere contention that Scalise, who issued a misbehavior report after finding contraband during a cell search, and Morse, who was in charge of the searched area and against whom plaintiff had filed a grievance, worked together was insufficient to demonstrate the requisite causation) (Dkt. No. 80-2). Accordingly, there is insufficient evidence proffered to raise a question of material fact regarding the causation element. Moreover, similar to Altman, Weingartner was not responsible for the ultimate decision

---

[12] It is undisputed that Altman's handwriting was on the EEP, indicating both ART and SOP were now part of Blake's programming. However, Altman does not remember referring or deciding the appropriateness of this action, because she could not. Altman received an email from the sex offender unit, specifically Elfeldt who was the only person with authority to recommend the treatment occur, presumably directing her to perform the ministerial task of including his recommendations in Blake's EEP.

leading to the argued adverse action. Weingartner submitted Blake as a referral to the sex offender unit and Elfeldt determined the appropriateness of the programming. Again, this link is too attenuated to establish a causal connection between Blake filing a grievance against Altman, Weingartner unilaterally referring Blake to the sex offender unit, and Elfeldt determining that SOP was appropriate to include in Blake's programming needs.

Blake has also failed to demonstrated that either Elfeldt's and Tousignant's actions were motivated by the filing of the grievance against Altman. Neither Elfeldt or Tousignant worked at Five Points. Neither Elfeldt or Tousignant had any knowledge of the grievance filed against Altman. Any assertions to the contrary are unfounded and conclusory as they lack the requisite specificity to establish a persuasive case against these individual defendants. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed [as] . . . the prisoner has no factual basis for the claim other than an adverse administrative decision . . . ."). Moreover, with respect to Tousignant, his recommendations for having sexual offender parole conditions occurred over six months and subsequent to a facility transfer from the filing of the grievance. This passage of time and distance between the filing of the grievance and Tousignant's recommendations for conditions, viewed within the context of Tousignant being unaware of both Altman and Blake, defeat claims of any causal connection based on proximity.

Accordingly, defendants' motion should be granted on that ground.

However, in the alternative, even if it could be said that a recommendation to SOP was an adverse action and that the requisite causal connection was established, Blake's complaint still must be dismissed because defendants' would have engaged in the same

action regardless of whether the grievance was filed.  <u>Graham</u>, 89 F.3d at 79.  The record is clear that SOP was also appropriate for individuals who were not convicted of sex crimes requiring sex offender registration upon release.  These individuals were referred to the sex offender unit, pursuant to a non-sex offender referral, if the individual was deemed to exhibit sexually offense behavior during the underlying criminal conduct which precipitated the arrest.  In Weingartner's and Elfeldt's professional opinions, promoting prostitution constituted such sexually offense conduct.  The crime was categorized by violence and coercion.  Weingartner asked Elfeldt if a referral was appropriate, Elfedlt stated that it was, and ultimately recommended the inclusion of SOP on Blake's EEP.  Both defendants expressed, in no uncertain terms, that their feelings about categorizing promoting prostitution as a crime worthy of SOP were steadfast and that any, and all, individuals with such underlying criminal conduct that were brought to their attention were consistently referred or recommended for SOP.  Accordingly, whether the grievance was filed or not, if and when Weingartner was made aware of Blake's underlying criminal conviction he would have initiated the SOP referral process.  Moreover, regardless of the grievance, Elfeldt would have recommended Blake for SOP, as he stated he had consistently done for any referral concerning an inmate convicted of promoting prostitution or whose underlying criminal conduct involved running a prostitution ring.

As the prior report-recommendation stated, "[i]f defendants' were going to recommend individuals with Blake's conviction to the SOP, the other two co-defendants reasonably should have also been included in the rehabilitation but were not.  Such actions may suggest intentional adverse action against Blake."  Dkt. No. 57 at 18-19.  For the reasons discussed <u>infra</u>, it is clear that defendants had no knowledge of Blake's other two co-

20

defendants.  Accordingly, for the same reasons discussed <u>infra</u>, Blake cannot prove that his inclusion in SOP was based on an intentional adverse action.  Had the other co-defendants been identified, pursuant to defendants' undisputed testimony, they too would have been referred and recommended for the SOP.  Accordingly, none of the individuals would have been treated differently had the defendants been made aware of Blake's co-defendants.

Accordingly, defendants' motion on this ground should be granted.


## C. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985); <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

<u>Vegas v. Artus</u>, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  With respect to prisoners, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . . means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  <u>Phillips v. Girdich</u>, 408

21

F.3d 124, 129 (2d Cir. 2005).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted). To succeed, a plaintiff must show "that [he] were intentionally treated differently from other similarly-situated individuals without any rational basis." Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006). Additionally, a plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ." Neilson, 409 F.3d at 104.

Blake has failed to establish membership in a protected class. However, it appears that Blake has adequately alleged a class of one claim, namely that he was treated differently from two other individuals that were convicted, with him, of the same crime. To satisfy a class of one claim, Blake must "allege (1) that [he was] intentionally treated differently . . . and (2) that the disparate treatment was either (a) irrational or wholly arbitrary or (b) motivated by animus." Assoko v. City of New York, 539 F. Supp. 2d 728, 735 (S.D.N.Y. 2008) (citations and internal quotation marks omitted). Despite Blake's allegations, he has failed to allege facts sufficient to raise a question of material fact regarding defendants' purposes regarding Blake's treatment.

Blake was not intentionally treated differently from either Smith or Carter because none of the defendants had any knowledge of them. Neither Smith nor Carter were ever housed at Five Points, so there is no way that either Altman or Weingartner would have had the opportunity to know of them. Since these defendants never interacted with Smith or Carter, there was never any possibility for disparate treatment. See Giordano v. City of New York,

22

274 F.3d 740, 752 (2d Cir. 2001) (requiring plaintiff to have "evidence in the record that would support a jury finding that [defendants] . . . knew that they were treating [plaintiff] differently from anyone else."). Moreover, to the extent there was differing treatment between Blake and his co-defendants, it was neither caused nor supported by Altman and Weingartner. Id.

The same is true for Elfeldt. Elfedlt relied upon receiving referrals from the correctional staff who were affiliated with each individual correctional facility. If a corrections counselor provided Elfedt with a referral for someone who had been convicted of promoting prostitution, or whose underlying criminal conduct involved running a prostitution ring, Elfeldt recommended that individual for SOP. It is undisputed that neither Smith nor Carter were ever referred to the sex offender unit by any corrections counselors at any of the facilities in which they were housed. Thus, Elfeldt cannot be said to have intentionally treated Blake differently because he was never given the opportunity to evaluate either of Blake's co-defendants. Conversely, Elfeldt maintains that had he been presented with referrals for these inmates, he would have recommended SOP. It was only due to inconsistencies in referrals coming from counselors at the facility level, of which Elfeldt had no control, that caused the perceived discrepancy in treatment between Blake and his co-defendants. Giordano, 274 F.3d at 752.

Similar arguments are also proffered for Tousignant. Tousignant was responsible for making parole condition recommendations for inmates at Upstate. Neither Smith nor Carter were permanently transferred to Upstate, thus neither of them would have received services for compiling a parole eligibility packet. Accordingly, Tousignant was never given the opportunity to meet or assess either of Blake's co-defendants. Thus, he never treated

23

either of them more favorably than Blake as he never had the occasion to be involved with them.  Giordano, 274 F.3d at 752.

Accordingly, defendants' motion should be granted on this ground.


## G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached with respect to any of Blake's allegations because, as discussed supra, it has not been shown that defendants violated Blake's constitutional rights.

24

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be **GRANTED** as to all claims and all defendants and **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the **Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  October 11, 2012
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge